IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF NORTH CAROLINA
CASE NO. 1:24-CV-576

| | | |
|---|---|---|
| KATRINA COLE, on behalf of herself and on behalf of all others similarly situated, | ) ) ) | |
| | ) | DEFENDANTS' RESPONSE IN |
| Plaintiff, | ) | OPPOSITION TO MOTION FOR |
| | ) | CONDITIONAL CERTIFICATION |
| v. | ) | |
| | ) | |
| UNIVERSAL HEALTH CARE/BLUMENTHAL, INC., and CHOICE HEALTH MANAGEMENT SERVICES, LLC, | ) ) ) ) | |
| | ) | |
| Defendants. | ) | |

## **INTRODUCTION**

While Choice Health managed seventeen healthcare facilities, it had a lawful

automatic meal break deduction policy. Individual supervisors at each facility managed

patient care employees, their meal breaks, and their compensation for missed breaks,

based in part on the reporting of individual employees.

Based on her alleged experiences at one facility, Katrina Cole asks this Court to

conditionally certify a collective of all hourly patient care employees at Choice Health-

managed facilities, alleging that the collective members were denied pay for work

performed during meal breaks. Ms. Cole's motion fails because she cannot show that the

proposed collective members were victims of a common unlawful policy. As to eleven

facilities, Ms. Cole offers no evidence at all. As to five other facilities, the only evidence

comes from fill-in-the-blank declarations of witnesses not disclosed in discovery, and

even that evidence does not show a common unlawful policy. Even as to the Blumenthal facility where she worked, Ms. Cole fails to show a common unlawful policy applicable to all hourly patient care workers. Conditional certification is properly denied.

<u>**STATEMENT OF THE FACTS**</u>

Until June 2024, Choice Health Management Services, LLC ("Choice Health") contracted with seventeen healthcare facilities (sixteen in North Carolina and one in South Carolina) to provide management services. Hensley Decl. ¶¶ 6-7 (Defs.' Ex. 4).

Each facility employed and paid its own administrator or executive director, a human resources coordinator, and hourly patient care workers. *See id.* ¶¶ 6, 10, 13. Hourly patient care workers included certified nursing assistants ("CNAs") and medication aides, who were generally assigned to work with residents on a particular hall of a facility, as well as other positions such as RN supervisors, who served patients more broadly. *Id.* ¶ 13.

The Choice Health-managed facilities included skilled nursing, assisted living, independent living, and combination skilled nursing/assisted living facilities. *Id.* ¶ 6. Residents' needs varied among the facility types and thus the facilities' patient care staffing needs varied. *Id.* ¶¶ 8-10. Even among the skilled nursing facilities, resident needs and staffing demands varied. *Id.* ¶¶ 11-12. Each facility administrator was responsible for deciding how to staff the facility based on resident needs. *Id.* ¶ 12.

Choice Health did not employ, supervise, or pay patient care workers; rather, individuals employed by the facilities employed, supervised, and paid their own staff.

Autry Decl. ¶¶ 5, 13 (Defs.' Ex. 6); *see* Hensley Decl. ¶¶ 13, 16-17, 20, 26.  Facility staff were responsible for scheduling, including scheduling meal breaks and ensuring coverage during breaks.  Hensley Decl. ¶ 17.  Scheduling practices varied according to the discretion of administrative staff at each facility.  *Id.*

### Choice Health's meal break policies

Choice Health's management services included publishing human resources policies and providing access to a timekeeping platform, Smartlinx.  Mustian Decl. ¶¶ 6, 9 (Defs.' Ex. 5); Autry Decl. ¶¶ 7-9.  Choice Health policy required facility employees to clock in and out of work on Smartlinx.  Hensley Decl. ¶ 14; Mustian Decl. ¶ 9.  Facility employees were required to take a 30-minute unpaid meal break during each shift of at least six hours and a one-hour unpaid meal break during each shift of at least twelve hours.  Hensley Decl. ¶ 14.  Each facility had at least one dedicated, patient-free break room.  *Id.* ¶ 18.  Employees could take breaks in the break room, or with permission, off the premises.  *Id.*

Employees were not on call during meal periods.  *Id.* ¶ 15.  Choice Health's policy was that "[l]unch breaks must be taken by employees away from the employee's work station *without performing any work during this time*."  DE 24-4 at 2 (emphasis added).

Under Choice Health policy, employees who remained on the premises were not required to clock out for meal breaks.  Hensley Decl. ¶ 19.  Smartlinx automatically deducted an unpaid break from each break-eligible shift (either 30 minutes or one hour, depending on shift length).  *See id.* ¶¶ 14, 21.  Choice Health policy provided that, if an

3

employee could not take a meal break, he or she should request a reversal of the automatic deduction to ensure payment for all hours worked. *Id.* ¶¶ 21, 27.

Operation of the meal break policy required compliance of the individual employees who took meal breaks and used Smartlinx. *See id.* When employees clocked out, Smartlinx prompted employees to note whether they received an uninterrupted meal break that day. *Id.*; *see* DE 24-4 at 5 (Smartlinx guidelines stating, "you must punch 'Full Meal Break Taken' or 'No Meal Break,' if you were unable to take your full 30-minute meal break"). Alternatively, the employee could fill out a "missed punch form" to request a reversal of the automatic deduction. Hensley Decl. ¶ 22. Choice Health provided a missed punch form for facilities to use, *id.* ¶ 23 & Defs.' Exs. 1 & 2, but Choice Health did not process those forms, Hensley Decl. ¶ 26; Autry Decl. ¶¶ 13-14.

Choice Health trained facility-level human resources staff on Choice Health meal break and timekeeping policies. Hensley Decl. ¶¶ 28-32; Mustian Decl. ¶¶ 7-8. Choice Health trained facility human resources coordinators that employees were entitled to compensation for interrupted meal breaks. Hensley Decl. ¶ 32; Mustian Decl. ¶ 12. The missed punch form in place as of March 2023 specifically provided an option to request compensation for an interrupted meal break. Hensley Decl. ¶ 23 & Defs.' Ex. 2.

Human resources staff at each facility were responsible for training their own patient care employees. Hensley Decl. ¶ 29. Facility staff—not Choice Health—collected and approved missed punch forms and made appropriate adjustments to pay. *Id.* ¶¶ 26, 33. Choice Health never received a complaint that any facility employee was

4

unable to take an uninterrupted meal break or was denied compensation for a missed meal break.  *Id.* ¶ 34.

***Blumenthal's staffing and implementation of break policies***

Universal Health Care/Blumenthal, Inc. ("Blumenthal") was a skilled nursing facility in Guilford County formerly managed by Choice Health.  Mustian Decl. ¶ 2; Autry Decl. ¶ 31.  Patient care needs varied within the facility, with assisted living residents mixed in with nursing patients.  Mustian Decl. ¶¶ 39-42.

Blumenthal's human resources director was trained on Choice Health meal break policies, *id.* ¶¶ 6-12, and she trained Blumenthal employees that they were entitled to compensation for missed or interrupted meal breaks, explained how to obtain reversal of the automatic deduction, and provided missed punch forms, *id.* ¶¶ 24-26.  Blumenthal did not have an on-call policy for hourly patient care workers.  *Id.* ¶ 23.

Blumenthal was divided into halls, each overseen by a unit manager, who was usually a licensed practical nurse or a registered nurse.  *Id.* ¶¶ 13-14.  Multiple CNAs were assigned to each hall.  *Id.* ¶ 13.

At Blumenthal, the procedures for taking meal breaks differed among medication aides, CNAs, and other hourly patient care employees.  *Id.* ¶ 17.  For example, some CNAs are qualified to serve as medication aides; other CNAs cannot administer medicine.  *Id.* ¶ 18.  Blumenthal medication aides were responsible for a locked medication cart.  *Id.* ¶ 19.  When medication aides took a meal break, they had to give

5

their cart keys to another medication aide, and thus they could not access the cart or administer medication during a meal break. *Id.* ¶ 20.

The unit manager prepared a schedule for the hall, including scheduled meal breaks for each CNA and medication aide. *Id.* ¶¶ 13, 15. Blumenthal's director of nursing approved the schedules. *Id.* ¶ 15. Some hourly patient care employees, such as wound nurses, created their own daily schedules and decided when to take meal breaks. *Id.* ¶ 21.

Blumenthal's hourly patient care employees regularly took breaks, often for longer than the allotted time. *Id.* ¶¶ 31-32. Although Choice Health policy required employees to clock out if they left the premises, many employees, including CNAs, left for breaks without clocking out. *Id.* ¶ 32. Blumenthal also had closed break rooms, inaccessible to patients, where hourly patient care employees often took meal breaks. *Id.* ¶ 33. No patient care employees reported concerns about missed or interrupted meal breaks to Blumenthal. *Id.* ¶¶ 28-30.

### Katrina Cole's employment

Katrina Cole worked at Blumenthal as a CNA and medication aide. DE 24-2 ¶ 2. Ms. Cole regularly took meal breaks, smoke breaks, and breaks to address family obligations. Mustian Decl. ¶ 35. Although she often asked questions about her pay, she never reported being unable to take a meal break or being denied pay for missed or interrupted meal breaks. *Id.* ¶ 38. In 2023, Ms. Cole was placed on a performance improvement plan for tardiness and attendance issues. *Id.* ¶ 37; Defs.' Ex. 3.

6

***Ms. Cole's complaint***

On July 12, 2024, Ms. Cole sued Blumenthal and Choice Health, alleging violations of the Fair Labor Standards Act and North Carolina Wage and Hour Act, and seeking to represent a collective/class of similarly situated employees. DE 1 ¶¶ 79-109. According to Ms. Cole, Defendants' automatic deduction policy resulted in hourly patient care workers at North Carolina facilities being deprived of compensation for meal breaks during which they worked or were interrupted. *Id.* ¶¶ 1-6, 25, 29, 67-78.

***Discovery***

The parties agreed to a schedule allowing approximately five months for discovery before Ms. Cole would file her motion for conditional certification. DE 14. With the exception of a potential deposition of Ms. Cole, DE 21, the Court ordered that "any discovery needed for submission and consideration on the conditional certification issue must be completed prior to March 21, 2025," DE 16.

The parties exchanged initial disclosures and written discovery. Dagger Decl. ¶¶ 3-8 (Defs.' Ex. 7). Ms. Cole identified twelve witnesses with knowledge of her allegations. Defs.' Ex. 9 at Resps. to Interrog. No. 1 & 9. Defendants produced more than 100,000 pages of records, including Smartlinx data for the entire proposed collective. Dagger Decl. ¶ 8.

***Motion for conditional certification***

On March 21, 2025, Ms. Cole moved for conditional certification of a collective of "[a]ll non-exempt hourly paid patient care employees that worked at a facility managed

by Choice Health Management Services, LLC at any time between July 11, 2021 and May 31, 2024 that were subject to an automatic meal period deduction[.]" DE 23 at 1. In her supporting brief, Ms. Cole stated that the proposed collective members worked at Defendants' North Carolina facilities. DE 24 at 1-4.

Ms. Cole submitted a declaration alleging that "[h]ourly care giver employees" were regularly interrupted during meal breaks, that she was not informed that she could be compensated for interrupted breaks, and that the director of nursing at her facility discouraged her from reporting missed meal breaks. DE 24-2 ¶¶ 6-11. Ms. Cole claimed that interruptions to her breaks "were most frequently caused by the need to go administer medication to a patient." *Id.* ¶ 7.

Ms. Cole also submitted four identical fill-in-the-blank declarations—not given under penalty of perjury—from other CNAs who collectively worked at five other facilities during the relevant time period. DE 24-5, -6, -7, -8. Ms. Cole did not disclose any of the declarants in discovery. Dagger Decl. ¶ 9 & Defs.' Exs. 8, 9, 10.

## QUESTION PRESENTED

WHETHER CONDITIONAL CERTIFICATION IS PROPERLY DENIED BECAUSE MS. COLE HAS NOT SHOWN THAT HOURLY PATIENT CARE EMPLOYEES AT FACILITIES MANAGED BY CHOICE HEALTH WERE SUBJECT TO A COMMON UNLAWFUL POLICY.

## LEGAL STANDARDS

An FLSA collective action may be brought by an employee on behalf of herself and "other employees similarly situated." 29 U.S.C. § 216(b). "Employees are similarly situated when they raise a similar legal issue" that arises from "at least a manageably similar factual setting with respect to their job requirements and pay provisions." *Clark v. Williamson*, No. 1:16-CV-1413, 2018 WL 1626305, at *2 (M.D.N.C. Mar. 30, 2018) (Schroeder, J.) (quotations omitted). "FLSA class certification takes place in two stages," conditional certification and decertification. *Id.*

At the first stage, the court "determines whether providing initial notification of the action to potential class members is appropriate." *Mebane v. GKN Driveline N. Am., Inc.*, No. 1:18-CV-892, 2023 WL 3435007, at *2 (M.D.N.C. May 12, 2023). In cases where the parties have not taken discovery, the court will apply a "fairly lenient" standard, *id.* (quotation omitted), but not a "rubber-stamp approach," *Clark*, 2018 WL 1626305, at *3 (quotation omitted). "The plaintiff must only make a relatively modest factual showing that a common policy, scheme or plan that violated the law exists." *Id.* (quotation omitted). Still, "the court must be mindful that granting conditional certification expands the scope of the litigation and begins a process of class-wide

9

discovery[.]" *Kirkpatrick v. Cardinal Innovations Healthcare Sols.*, No. 1:16-CV-1088, 2017 WL 3841858, at *4 (M.D.N.C. Sept. 1, 2017) (Schroeder, J.).

Where, as here, the parties had five months to take discovery before conditional certification, the Court can apply an intermediate standard. *See Blaney v. Charlotte-Mecklenburg Hosp. Auth.*, No. 3:10-CV-592-FDW-DSC, 2011 WL 4351631, at *5 (W.D.N.C. Sept. 16, 2011). Even under a lenient standard, however, Ms. Cole is not entitled to conditional certification because she has not shown that patient care employees of seventeen different facilities "were victims of a common policy or plan." *See Clark*, 2018 WL 1626305, at *4.

## ARGUMENT

**EVEN UNDER A LENIENT STANDARD, MS. COLE FAILS TO SHOW THAT HOURLY PATIENT CARE EMPLOYEES OF FACILITIES MANAGED BY CHOICE HEALTH WERE SUBJECT TO AN UNLAWFUL COMMON POLICY.**

As to eleven of the facilities, there is no evidence of any common policy other than the "perfectly lawful" meal break deduction policy. *See Marshall v. Novant Health, Inc.*, No. 18-CV-00633, 2020 WL 5577888, at *7 (W.D.N.C. Sept. 17, 2020). As to five other facilities, the only evidence comes from identical declarations of undisclosed witnesses that likewise fail to support certification. Ms. Cole's account of her individual experience is not sufficient for the Court to conclude that she and other patient care employees were victims of any common unlawful policy.

10

**A. Ms. Cole Has Not Offered Evidence That Another Collective-Wide Policy Worked in Concert with the Automatic Deduction to Deprive Employees of Pay for Work Performed During Meal Breaks.**

"[I]t is well established that automatic meal-deduction systems are perfectly lawful under the FLSA." *Marshall*, 2020 WL 5577888, at *7; *accord Chapman v. Saber Healthcare Grp., LLC*, 623 F. Supp. 3d 664, 675 (E.D. Va. 2022). Employers need not pay their employees for breaks of at least 30 minutes when the employee is "completely relieved from duty for the purposes of eating regular meals," 29 C.F.R. § 785.19(a), and an automatic deduction policy is a permissible mechanism to account for these breaks, *see Chapman*, 623 F. Supp. 3d at 675; *Marshall*, 2020 WL 5577888, at *7; *Blaney*, 2011 WL 4351631, at *6.

Therefore, a plaintiff cannot show that she and others were "victims of a common policy or plan," *Clark*, 2018 WL 1626305, at *3, by relying on an automatic deduction policy, *see Chapman*, 623 F. Supp. 3d at 675. Rather, "a plaintiff seeking conditional certification must show that an automatic meal break deduction works in concert with some other policy or practice to deprive employees of pay for work performed during unpaid meal breaks." *Id.* For example, conditional certification may be appropriate if the plaintiff shows that a combination of common policies—such as (1) "an employer's expectation that employees remain on call during their meal breaks, in combination with an automatic meal break deduction policy"; or (2) "an employer's practice of routinely ignoring or discouraging the use of time adjustment forms to correct an erroneous

11

deduction," combined with an automatic deduction policy—worked to deny employees compensation.  *Id.*

Ms. Cole asserts both theories—an on-call policy and a policy of discouraging submission of missed punch forms to correct erroneous deductions.  DE 24-2 ¶¶ 6, 11. Neither theory prevails.

### 1. There is no evidence of an on-call policy at Choice Health-managed facilities.

Choice Health's written policy was that workers were *not* on call during meal breaks:  Ms. Cole submitted a Choice Health policy providing that "[l]unch breaks must be taken by employees away from the employee's work station without performing any work during this time."  DE 24-4 at 2.  Ms. Cole cannot show an unwritten on-call policy by citing the general nature of patient care work.  *See* DE 24 at 5.  She asserts in her brief, without citation,[1] that patient care workers must "put patient care first, no matter what," and thus must "remain responsive and alert for their assigned patients' needs at all times throughout their shifts, even during attempted on-premises meal breaks (whether paid or unpaid)."  *Id.*  Ms. Cole suggests that being on call during meal breaks is inherent in the obligations of a patient care worker, regardless of the employer's policy.  *See id.*[2]

---

[1] Ms. Cole repeatedly violates the mandate of the local rules that "[e]ach statement of fact should be supported by reference to a part of the official record in the case."  LR7.2(a)(2).

[2] Ms. Cole cites out-of-circuit district court cases, DE 24 at 16-17, but in many of those cases, unlike here, the plaintiffs offered affidavit testimony about policies that required employees to tend to patient needs even during meal breaks and/or training that employees should put patient care needs over meal breaks.  *See, e.g.*, *Flynn v. Colonial Mgmt. Grp.*, No. 23-CV-00128, 2023 WL 7165194, at *7-8 (D.N.M. Oct. 31, 2023); *Gray*

12

Accepting this argument would require conditional certification in every case where patient care workers were subject to an automatic deduction policy, because courts would be required to assume that every patient care worker is necessarily on call, regardless of employer policy. That is not the law. Even in cases involving patient care workers, courts have recognized that an automatic deduction policy, standing alone, is legal. *See Chapman*, 623 F. Supp. 3d at 675; *Marshall*, 2020 WL 5577888, at *7; *Blaney*, 2011 WL 4351631, at *6. For example, in *Blaney*, the court declined to conditionally certify a collective at a hospital system that had a similar automatic deduction policy, where the record did not show a hospital-wide on-call policy. 2011 WL 4351631, at *1, *7. The court explained that without a collective-wide policy of being on call during meal breaks, "Plaintiffs are left with only a lawful policy of automatic deductions." *Id.*

Ms. Cole's account of her own experience and the declarations of four witnesses are insufficient to show an on-call policy across all Choice Health-managed facilities. *See* DE 24-2 ¶ 6; DE 24-5 ¶ 5; DE 24-6 ¶ 5; DE 24-7 ¶ 5; DE 24-8 ¶ 5. Neither Ms. Cole nor the four witnesses ever worked at eleven of the facilities, Autry Decl. ¶¶ 17-30, none purport to have knowledge of facilities where they did not work, DE 24-2, -5, -6, -7, -8 *passim*, and scheduling matters were decentralized—they were handled at the facility level by individual managers, *supra* pp. 2-3.

---

*v. Delta Cnty. Mem'l Hosp. Dist.*, No. 19-CV-02938, 2021 WL 1329263, at *1-2 (D. Colo. Mar. 1, 2021); *Gauzza v. Prospect Med. Holdings, Inc.*, No. 17-cv-3599, 2018 WL 5452746, at *2 (E.D. Pa. Oct. 26, 2018); *Galt v. Eagleville Hosp.*, 238 F. Supp. 3d 733, 736 (E.D. Pa. 2017). There is no evidence of such a policy or training here.

13

*Chapman* is instructive.  There, relying on his experience and declarations of three other employees, the plaintiff sought conditional certification of a collective of patient care workers at all facilities either owned by Autumn Corporation or affiliated with Saber Healthcare.  623 F. Supp. 3d at 671, 677.  Collectively, the plaintiff and declarants had worked at five facilities.  *Id.*  Even under a lenient standard, the *Chapman* court found that "Plaintiff's sample is far too small and homogenous for the Court to conclude that it is representative of all facilities, and the record is devoid of evidence demonstrating that Saber directed the unlawful meal break practices."  *Id.* at 677.  The court granted conditional certification only as to CNAs at the facilities where either the plaintiff or declarants worked and otherwise denied certification.  *Id.*; *accord Saleen v. Waste Mgmt., Inc.*, 649 F. Supp. 2d 937, 940-41 (D. Minn. 2009) (denying conditional certification where plaintiff relied on affidavit testimony about missed meal breaks from small fraction of proposed collective).

Here, as in *Chapman*, conditional certification of a collective spanning facilities where neither Ms. Cole nor her declarants worked is inappropriate.  *See* 623 F. Supp. 3d at 677 & n.6.  Although all facilities used Choice Health's automatic deduction system, there is no evidence that *Choice Health* directed unlawful practices by requiring facility workers to be on call or discouraging submission of missed punch forms.  Hensley Decl. ¶¶ 3, 21; Mustian Decl. ¶ 3.  To the contrary, scheduling, oversight of meal breaks, and submission of missed punch forms were all handled at the facility level by individual supervisors employed by others.  *See supra* pp. 2-5.  And many employees at Choice

14

Health-managed facilities were paid for missed meal breaks in accordance with Choice Health's written policies. *See* Autry Decl. ¶¶ 20, 25, 27-28; *see also Saleen*, 649 F. Supp. 2d at 942-43 (noting that evidence of numerous occasions on which defendants paid for meal breaks was difficult to reconcile with allegations of policy of refusing to pay employees who worked through meal breaks).

To the extent Ms. Cole contends that there is a collective-wide on-call policy because employees are required to take meal breaks on their facility's premises, DE 24 at 6, that argument also fails. Choice Health policy allowed individual managers to permit off-premises breaks. *See* DE 24-4 at 2 ("Employees are not permitted to leave the premises during break periods without management authorization."). Blumenthal employees often took off-premises breaks. Mustian Decl. ¶ 32.

Further, Ms. Cole argues, without citation, that requiring employees to take on-premises meal breaks makes those breaks "presumptively compensable," DE 24 at 6, but the law says otherwise, *see* 29 C.F.R. § 785.19(b) ("It is not necessary that an employee be permitted to leave the premises if he is otherwise completely freed from duties during the meal period."). Although confinement to the worksite is a factor in determining the compensability of mealtime, *Roy v. County of Lexington*, 141 F.3d 533, 545-46 (4th Cir. 1998), Choice Health policy required breaks to be taken "away from the employee's work station" and in "designated non-work areas." DE 24-4 at 2; *accord* Hensley Decl. ¶ 18.

15

2. **There is no evidence of a common policy of discouraging submission of missed punch forms for missed or interrupted meal breaks.**

Ms. Cole cannot show a common policy of discouraging submission of missed punch forms because she is the only witness who claims she was discouraged from requesting compensation for missed breaks. *See* DE 24-2 ¶ 11.

Ms. Cole acknowledges that patient care workers were prompted by timekeeping software to indicate whether they received a meal break. DE 24 at 7. In her brief, she asserts, without citation, that Defendants "actively discourage the non-exempt patient care workers from reporting they did not receive a full, compliant meal break (i.e., the supervisors discourage Cole *and the other workers* from requesting payment for their on-duty meal breaks)." *Id.* (emphasis added). Notably, Ms. Cole does not go so far in her declaration. Instead, she alleges only, "The director of nursing at *my facility*[3] discouraged *me* from reporting missed meal breaks," and "*I* also recall submitting missed meal break forms that were disregarded by management." DE 24-2 ¶ 11 (emphases added).

Ms. Cole does not claim to know of any other employee at any facility who was discouraged from reporting a missed meal break or whose missed meal break forms were

---

[3] The director of nursing at Blumenthal and Blumenthal's facility administrator never worked at any other Choice Health-managed facility. Autry Decl. ¶ 31.

disregarded, *see id.*, and no witness claims to have shared those experiences, *see* DE 24-5, -6, -7, -8.[4]

Evidence that Ms. Cole and four others did not know they should be compensated for interrupted meal breaks, DE 24-2 ¶ 9; DE 24-5 ¶¶ 7-8; DE 24-6 ¶¶ 7-8; DE 24-7 ¶¶ 7-8; DE 24-8 ¶¶ 7-8, does not show that Choice Health had a common practice of *discouraging* submission of missed punch forms. Ms. Cole cites no authority requiring an employer to affirmatively train employees on interrupted meal breaks. *See* DE 24 *passim*. Further, the lack of understanding of five employees cannot be generalized to the proposed collective, particularly in the face of written policies stating that employees must not "perform[] any work" during lunch breaks and the automatic prompt within Smartlinx requiring the employee to confirm a full break. DE 24-4 at 2. Choice Health's missed punch form, as revised in March 2023, specifically identified a meal break that was "interrupted for a work-related reason" as an example of "No Meal Break." Hensley Decl. ¶¶ 23, 25; Defs.' Ex. 2. As in *Blaney*, "instead of a common policy that violated the law, Plaintiffs have only alleged a situation in which they were too uninformed to take care of their own business." 2011 WL 4351631, at *9.

---

[4] In contrast, in *Magpayo v. Advocate Health & Hospitals Corp.*, No. 16-CV-01176, 2018 WL 950093, at *2, *6 (N.D. Ill. Feb. 20, 2018), DE 24 at 17, there was affidavit testimony about employees informing their supervisors about working through meal breaks because of short-staffing, and at meetings, the supervisors urging them to "hang in there."

Ms. Cole's individual experience of allegedly having a Blumenthal supervisor discourage her from reporting missed meal breaks is not evidence of a common policy. *See England v. New Century Fin. Corp.*, 370 F. Supp. 2d 504, 507 (M.D. La. 2005) ("A court may deny plaintiffs' right to proceed collectively if the action arises from circumstances purely personal to the plaintiff, and not from any generally applicable rule, policy, or practice."); *cf. Chapman*, 623 F. Supp. 3d at 676 (granting conditional certification, in part, where all declarants made "specific allegations illustrating how they were discouraged from submitting time adjustment forms"). Because there is no evidence of a common practice of discouraging or ignoring requests to correct deductions for missed breaks, Ms. Cole is not entitled to certification on this theory.[5]

## B. Declarations of Four Former Employees Do Not Show Workers at Those Facilities Were Subject to a Common Unlawful Policy.

Ms. Cole cannot show a common policy by relying on declarations of four other employees who worked at five facilities, collectively, during the relevant period. *See* DE 24-5 ¶ 3; DE 24-6 ¶ 3; DE 24-7 ¶ 3; DE 24-8 ¶ 3. None of these employees purports to have knowledge of facilities where they never worked, *see* DE 24-5, -6, -7, -8, and thus their declarations do not support extending the collective to all Choice Health-managed

---

[5] At a minimum, Ms. Cole has not shown that she is similarly situated to patient care workers at eleven facilities where neither she nor her witnesses ever worked, and conditional certification as to those facilities is properly denied. *See Chapman*, 623 F. Supp. 3d at 677.

18

facilities.[6]  Even as to the five facilities where these employees worked, these declarations do not show a common unlawful policy.  As shown below, two witnesses worked at facilities where other employees regularly obtained meal break deduction reversals, another worked only three break-eligible shifts, and another never worked in North Carolina.  *See infra* pp. 21-22.

### 1. Rule 37(c)(1) prohibits Ms. Cole from relying on the declarations because she failed to disclose the witnesses.

The declarations are not properly considered under the scheduling order, DE 16, because Ms. Cole failed to disclose the witnesses, *see* Dagger Decl. ¶¶ 7, 9.

"Rule 37(c)(1) provides that a party who fails to identify a witness as required by Rule 26(a) or (e) is not allowed to use that witness to supply evidence on a motion" unless the party shows "that the failure to disclose is substantially justified or harmless." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 329 (4th Cir. 2011).  Ms. Cole cannot make that showing.  Discovery began almost five months before Ms. Cole moved for conditional certification, and Defendants served their discovery requests more than four months prior to the conditional certification discovery deadline.  Dagger Decl. ¶ 4.  Ms. Cole did not disclose a single patient care employee who worked at a facility other than Blumenthal.  *See* Defs.' Exs. 8, 9, 10.  The declarations are dated between March 3 and 6, 2025, showing that Ms. Cole knew at least two weeks before the close of pre-motion discovery

---

[6] In contrast, in *Brown v. Permanente Med. Grp.*, No. 16-CV-05272, 2017 WL 1536493, at *1-2 (N.D. Cal. Feb. 2, 2017), DE 24 at 17, employees did claim to have knowledge of practices at other facilities based on their interactions with employees at other facilities.

that she would rely on the witnesses.  DE 24-5, -6, -7, -8.  Ms. Cole's failure to identify the witnesses deprived Defendants of the opportunity to take pre-motion discovery from them or timely search for and produce additional discovery pertaining to them or the facilities where they worked.  *See* Dagger Decl. ¶¶ 7, 9.  Rule 37(c)(1) thus requires exclusion of the declarations.  *See, e.g.*, *Pickering v. Lorillard Tobacco Co.*, No. 2:10-CV-633, 2012 WL 314691, at *15 (M.D. Ala. Jan. 30, 2012) (declining to consider declaration of undisclosed witness at conditional certification stage); *see also Holak v. K Mart Corp.*, No. 1:12-CV-00304, 2014 WL 4930762, at *3-4 (E.D. Cal. Sept. 30, 2014) (striking declarations of undisclosed witnesses submitted with class certification motion).

### 2.    The declarations have minimal evidentiary value.

Regardless, the declarations are entitled to little weight because they contain identical, generic allegations, "suggesting that the declarants signed them without significant reflection."  *Yerger v. Liberty Mut. Grp., Inc.*, No. 5:11-CV-238-D, 2011 WL 5593151, at *5 (E.D.N.C. Nov. 15, 2011); *see also Smith v. Smithfield Foods, Inc.*, No. 2:21-CV-194, 2021 WL 6881062, at *9 (E.D. Va. Dec. 21, 2021) (finding that "identical and inconsistent" declarations of opt-in plaintiffs provided "meager factual support" for conditional certification), *report and recommendation adopted*, 2022 WL 407378 (E.D. Va. Feb. 9, 2022).[7]  Without even identifying their job titles, the declarants make general

---

[7] The identical statements are particularly suspect where, as here, none of the declarants signed under penalty of perjury as required by 28 U.S.C. § 1746.  *See* DE 24-5, -6, -7, -8; *see also Payne v. River Rocks LLC*, No. 6:15-CV-1727, 2016 WL 8669876, at *4 (M.D. Fla. Sept. 9, 2016) (denying conditional certification and affording no weight to declaration not made under penalty of perjury and not supported by other evidence);

assertions that "other caregiver employees like me" were interrupted during meal breaks and that their facilities did not train "hourly workers like me" on reporting interrupted breaks. DE 24-5 ¶¶ 6-7; DE 24-6 ¶¶ 6-7; DE 24-7 ¶¶ 6-7; DE 24-8 ¶¶ 6-7. No declarant describes any specific experience, such as a statement by a supervisor or an observation of another employee being interrupted during a meal break. DE 24-5, -6, -7, -8.

The declarations do not show that the employees are similarly situated to each other or Ms. Cole. Unlike Ms. Cole, who claims a supervisor discouraged her from requesting compensation for interrupted or missed meal breaks, DE 24-2 ¶ 11, no declarant says they were discouraged from seeking such compensation, DE 24-5, -6, -7, -8 *passim*. To the contrary, all four declarants allege that if they had understood their facility's policy better, they would have submitted *more* requests for reversal of the automatic deduction. DE 24-5 ¶ 8; DE 24-6 ¶ 8; DE 24-7 ¶ 2; DE 24-8 ¶ 8.

Specific evidence indicates that the declarants' co-workers understood the policy. For example, during the relevant period, declarant James Dewberry worked only twelve shifts with meal break deductions, all at UHC Fuquay Varina, where other employees regularly obtained reversals of the automatic deduction. Autry Decl. ¶¶ 23-25.[8]

---

*Martinez v. Zero Otto Nove Inc.*, No. 15 CIV. 899, 2016 WL 3554992, at *3 (S.D.N.Y. June 23, 2016) (denying conditional certification and declining to consider declaration not made under penalty of perjury).

[8] Mr. Dewberry also reported working at another facility, UHC Lillington, DE 24-7 ¶ 3, but he only worked there before the relevant period, and other employees there successfully obtained reversals of the automatic deduction, Autry Decl. ¶¶ 26-27.

21

Hermenia Spellman also worked at a facility where other employees regularly obtained reversals. *Id.* ¶ 28.

Janil McFadden's declaration illustrates the danger of allowing FLSA plaintiffs to rely on identical form declarations not given under penalty of perjury. *See* DE 24-6. Ms. McFadden, like each other declarant, asserts, "I worked more than 40 hours in a week in some weeks when I was deducted for meal breaks I was not able to actually take." *Id.* ¶ 9. Ms. McFadden, however, only ever worked a total of four shifts (three break-eligible shifts) for any Choice Health-managed facility, and she never exceeded 23.25 hours in a single week. Autry Decl. ¶¶ 17-18.[9] At best, Ms. McFadden signed a form declaration "without significant reflection," *Yerger*, 2011 WL 5593151, at *5, as opposed to intentionally falsely attesting (without subjecting herself to the penalty of perjury) that she had worked more than 40 hours in some weeks, *see* DE 24-6 ¶ 9.

Finally, Mary Stone's declaration appears irrelevant. *See Hager v. Omnicare, Inc.*, No. 19-CV-00484, 2020 WL 5806627, at *7 n.4 (S.D. W. Va. Sept. 29, 2020) (declining to consider declarations that were not relevant to proposed collective). Ms. Stone worked only at a facility in South Carolina, DE 24-8 ¶ 2; Autry Decl. ¶ 29, while Ms. Cole argues for certification of a collective of workers at "Defendants' facilities in North Carolina," DE 24 at 1; *see id.* at 2-4.

---

[9] James Dewberry only worked one week in excess of 40 hours during the proposed class period. Autry Decl. ¶ 24. These facts were available at the time Ms. Cole moved for conditional certification, because Defendants produced the Smartlinx data, including for Ms. McFadden and Mr. Dewberry, in pre-certification discovery. Dagger Decl. ¶ 8.

### C. Ms. Cole Has Not Shown That She Is Similarly Situated to Other Patient Care Employees at Blumenthal.

#### 1. There is insufficient evidence that Ms. Cole and other patient care employees at Blumenthal were victims of a common policy.

Even as to Blumenthal, Ms. Cole has not shown a common unlawful policy. Ms. Cole does not allege that her experiences were common to her co-workers. *See* DE 24-2 *passim*. She says only that she is "aware of other CNAs and other patient care employees at my facility [who] also had to work during their meal breaks, had their meal breaks interrupted, or were subject to having their meal breaks interrupted"; she does not allege that these other employees were discouraged from reporting missed meal breaks or that they were not paid for all missed or interrupted meal breaks. *See id.* ¶ 12. Nor does she allege that she is aware of another Blumenthal employee who did not know they should be compensated for interrupted meal breaks. *See id. passim*.

Ms. Cole's alleged experience appears to have been unique. Blumenthal's human resources coordinator trained patient care employees that they should be compensated for interrupted meal breaks. Mustian Decl. ¶ 26. And, although Ms. Cole identified twelve former Blumenthal co-workers in her discovery responses, Defs.' Ex. 9 at Resp. to Interrog. No. 1, none of them submitted statements in support of conditional certification, DE 24 *passim*. Ms. Cole's individual experience does not warrant collective treatment.

23

## 2. Even as to Blumenthal, Ms. Cole has not shown that she is similarly situated to patient care employees other than medication aides.

At a minimum, Ms. Cole has not shown that she is similarly situated to *all* other hourly patient care employees, and certification must be limited accordingly. No declarant had a title other than CNA, Autry Decl. ¶¶ 17-29, and Ms. Cole worked only as a CNA or medication aide, DE 24-2 ¶ 2. Neither Ms. Cole nor her declarants purport to know the experience of other categories of patient care employees, DE 24-2, -5, -6, -7, -8 *passim*, some of whom scheduled their own meal breaks, Mustian Decl. ¶ 21.

Because Ms. Cole worked as a medication aide, DE 24-2 ¶ 2, her account cannot even be generalized to all CNAs at Blumenthal. Ms. Cole claims that the primary cause of her allegedly interrupted meal breaks was "the need to go administer medication to a patient." *Id.* ¶ 7. That experience cannot be common to all Blumenthal CNAs because only medication aides could give medication. Mustian Decl. ¶ 18; *see id.* ¶¶ 19-20.

In similar circumstances, the *Chapman* court rejected a request to conditionally certify a collective including all patient care workers subject to an automatic deduction policy. 623 F. Supp. 3d at 677-78. The plaintiff's claim "relie[d] fundamentally on the fact that putative collective members were regularly unable to take meal breaks because of chronic understaffing and the inability to leave patients without coverage. Viewed that way, the collective must be composed of only those positions that face such challenges." *Id.* The *Chapman* plaintiff and declarants were CNAs. *Id.* at 678. Because there was no

24

evidence that the automatic deduction affected other patient care workers the same way, the *Chapman* court limited the collective to CNAs. *Id.*

Likewise, Ms. Cole relies on being interrupted to administer medication, DE 24-2 ¶ 7, a responsibility specific to medication aides, Mustian Decl. ¶ 18. Any collective is properly limited to "those positions that face such challenges"—here, medication aides at Blumenthal. *See Chapman*, 623 F. Supp. 3d at 677-78.

## <u>CONCLUSION</u>

For the reasons stated above, Defendants respectfully request that the Court deny Ms. Cole's motion for conditional certification.

This the 12th day of May, 2025.

ELLIS & WINTERS LLP

/s/ Kelly Margolis Dagger
Andrew S. Chamberlin
NC. State Bar No. 17369
Derrick C. Foard
N.C. State Bar No. 54183
Post Office Box 2752
Greensboro, North Carolina 27402
Telephone: (336) 217-4193
Facsimile: (336) 217-4198
andrew.chamberlin@elliswinters.com
derrick.foard@elliswinters.com

Kelly Margolis Dagger
N.C. State Bar No. 44329
Michelle A. Liguori
N.C. State Bar No. 52505
P.O. Box 33550
Raleigh, North Carolina 27636
Telephone: (919) 865-7000
Facsimile: (919) 865-7010
kelly.dagger@elliswinters.com
michelle.liguori@elliswinters.com

*Counsel for Defendants Universal Health
Care/Blumenthal, Inc., and Choice Health
Management Services, LLC*

26

## <u>CERTIFICATE OF WORD COUNT</u>

The undersigned hereby certifies that this brief, excluding those parts exempted by LR 7.3(d)(1), complies with the word limitation of LR 7.3(d)(1), because it contains 6,236 words according to the word count function on counsel's word-processing software.

This the 12th day of May, 2025.

ELLIS & WINTERS LLP

<u>/s/ Kelly Margolis Dagger</u>
Kelly Margolis Dagger